**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: CUTERA SECURITIES
LITIGATION,

DOUG HAMILTON,
                            *Plaintiff,*
            and

GUNAWAN ONIE; ZAHED SIDDIQUE;
JAMIE W. COLLINS; KENNETH J.
CHIN; GARY T. HORNYAK,
            *Plaintiffs-Appellants,*

            v.

KEVIN CONNERS; ROBERT J.
SANTILLI; CUTERA, INC.,
            *Defendants-Appellees.*

No. 08-17627

D.C. No.
3:07-cv-02128-
VRW

OPINION

Appeal from the United States District Court
for the Northern District of California
Vaughn R. Walker, Chief District Judge, Presiding

Argued and Submitted
February 11, 2010—San Francisco, California

Filed June 30, 2010

Before: David R. Thompson and M. Margaret McKeown,
Circuit Judges, and Thomas S. Zilly,
Senior District Judge.*

*The Honorable Thomas S. Zilly, Senior United States District Judge
for the Western District of Washington, sitting by designation.

Opinion by Judge McKeown

---

**COUNSEL**

Frederick W. Gerkins, III, Glancy Binkow & Goldberg LLP, Los Angeles, California, for the appellant.

Paul D. Clement and Zachary D. Tripp, King & Spaulding LLP, Washington, D.C., for the appellee.

---

**OPINION**

McKEOWN, Circuit Judge:

Gunawan Onie and other plaintiffs (the "investors") appeal the dismissal of their securities fraud class action against Cutera, Inc., its chief executive officer, Kevin Connors, and its chief financial officer, Robert J. Santilli (collectively "Cutera"), under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934. In this fraud-on-the-market suit, the investors claim that Cutera provided false and misleading revenue projections and failed to disclose material information about the shortcomings of Cutera's sales staff.

We conclude that Cutera's alleged incomplete disclosures about its sales force are not material omissions made in violation of the securities laws, and that Cutera's earnings projections fall within the statutory safe harbor for forward-looking projections under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-5. We therefore affirm the district court's dismissal of the suit under Federal Rule of Civil Procedure 12(b)(6).

## BACKGROUND

Cutera sells lasers and other light-based aesthetic systems to medical professionals for use in cosmetic procedures, primarily through its direct sales force. In 2005, Cutera expanded its senior sales force and by 2006 met with considerable success, increasing its revenue 44%, "primarily [due] to increased sales and marketing efforts and [its] higher concentration of direct sales employees in the United States." In late 2005, Cutera also embarked on an aggressive sales force expansion plan to market a lower-priced laser (the "Solera Opus") through junior sales representatives. The expansion was complete by May 2006 and Cutera projected it would take two quarters for the junior sales representatives to reach target productivity. In a January 31, 2007 conference call with analysts reporting results from the third quarter of 2006, Connors attributed growth to the success of the senior sales force but stated that Cutera was "looking to improve upon the sales productivity" of the junior sales team.

The junior sales force failed to move the Solera Opus, and Cutera abandoned the program. By the end of March 2007, only two junior representatives remained in their original roles, while the rest had transferred to other positions within Cutera or left the company.

The investors purchased Cutera stock between January 31, 2007 and May 7, 2007 (the "class period"). In a January 31, 2007 press release and conference call, Cutera disclosed that it "didn't get the productivity [it was] looking for" from the junior sales staff, and that it had "since made modifications to the [alignment] of the sales organization." Cutera nonetheless projected first quarter and year end revenues in 2007 of $26 million and $126 million respectively, a growth of 25% over the previous year. Cutera's stock value jumped from $28.62 to $33.38 the next day.

Cutera's stock price stayed above $32 throughout February and March 2007, peaking on April 4, 2007 at $38.39 a share.

On April 5, 2007, Cutera revised revenue projections for the first quarter of 2007 down from $26 million to $23 million, stating the shortfall "was due primarily to lower than expected productivity levels of [the] recent sales expansion." That same day, Cutera's stock price dropped more than 30% to $26.67. The stock price hovered between $24.83 and $30.06 between April 5 and May 7, 2007, when Cutera reported final first quarter revenues of $23.3 million, laying the shortfall at the feet of "the unsuccessful implementation of [the] junior sales program, unusually high sales employee turnover, and disappointing results" from certain national accounts. By the close of business May 8, 2007, Cutera shares closed at $23.40, a loss of $5.33 per share or more than 18% off the previous day's price.

The investors allege that on January 31, 2007, Cutera did not adequately disclose the poor performance of the junior sales force, leading to artificially inflated stock prices, and thus failing to provide investors with information material to whether they should purchase Cutera stock. This claim rests on the charge that Cutera knew about the significant shortcomings of the junior sales program before the beginning of the class period. As a result, the investors claim that in April and May 2007, when Cutera more fully disclosed the problems with its sales staff and associated shortfalls in earning projections, the stock price fell, causing a loss to investors.

The district court granted Cutera's motion to dismiss the complaint, finding no material difference between Cutera's January 31, 2007 disclosures and later disclosures in spring 2007 and concluding that the alleged failure to fully disclose information about the junior sales staff did not sufficiently allege a violation of securities laws. The district court further held that allegations about Cutera's misleading earnings projections fell within the PSLRA's safe harbor for forward-looking statements. The district court dismissed the complaint without prejudice to allow the investors to amend the complaint to "allege—with the particularity contemplated by the

[PSLRA]—that the factors which accounted for Cutera's deviation from the January earnings projection were not warned against in the cautionary statements that accompanied the January protections." The investors eschewed the amendment option and instead filed an appeal.

We review *de novo* the district court's dismissal of the complaint for failure to state a claim under Rule 12(b)(6). *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). While a well-pleaded complaint may proceed even if we conclude that "actual proof of those facts [alleged] is improbable, and that a recovery is very remote and unlikely," *Gilead*, 536 F.3d at 1057 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)), a complaint "is properly dismissed if it fails to plead enough facts to state a claim to relief that is plausible on its face." *Id.* at 1055 (quoting *Twombly*, 550 U.S. at 570) (internal citations and quotation marks omitted).

The PSLRA imposes a heightened pleading standard in securities litigation and requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Plaintiffs must allege with particularity both "the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.' " *Tellabs, Inc. v Makor Issues & Rights, Ltd*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976)); *see also* 15 U.S.C. § 78u-4(b)(2). To surmount a motion to dismiss, the investors must thus plead facts sufficient to plausibly articulate "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).

Forward-looking statements like the earnings projections are further insulated from liability. Earnings projections iden-

tified as forward-looking statements and accompanied by adequate cautionary language fall within the PSLRA safe harbor, 15 U.S.C. § 78u-5(c)(1)(A)(i), as do other forward-looking statements not identified and not accompanied by cautionary language, unless they were "made with actual knowledge . . . that [they were] false or misleading." *Id.* §§ 78u-5(c)(1)(B)(i)&(ii)(II).

## ANALYSIS

**[1]** Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Pursuant to this section, the Securities and Exchange Commission promulgated Rule 10b-5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Central to a 10b-5 claim is the requirement that a misrepresentation or omission of fact must be material. Because the allegations do not meet this standard, we need not consider the other elements of a 10b-5 claim.[1] We also agree with the district court that the alleged misstatements regarding Cutera's projected earnings fall within the PSLRA safe harbor.

---

[1]In addition to materiality, a successful Rule 10b-5 claim must allege "(2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *Sparling v. Daou (In re Daou Sys.)*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)). "If one of these elements is missing, [the investors'] claim fails." *Paracor Fin., Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996).

## I. Materiality

The central question is whether the claimed misstatements or omissions were material. Although "determining materiality in securities fraud cases should ordinarily be left to the trier of fact," *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) (internal citation and quotation marks omitted), "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Halkin v. VeriFone Inc. (In re VeriFone Sec. Litig.)*, 11 F.3d 865, 868 (9th Cir. 1993) (internal citations omitted). The PSLRA reinforces this longstanding general principle of securities law and imposes a heightened pleading standard. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 165 (2008) ("[T]he PSLRA . . . imposed heightened pleading requirements . . . upon 'any private action' arising from the Securities Exchange Act."). To plead materiality, the investors must (1) specify each allegedly misleading statement or omission, (2) explain why the statement is misleading, and (3) if the allegation "regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).[2]

**[2]** It is not enough for the investors to plead that Cutera failed to make a full disclosure about its sales force. "Rule 10b-5 [prohibits] only misleading and untrue statements, not statements that are incomplete. . . . Often, a statement will not mislead even if it is incomplete or does not include all relevant facts." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Instead, "a statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982,

---

[2]All of the allegations made against Cutera were made on information and belief, so the investors must meet this third materiality requirement.

985 (9th Cir. 2008) (internal citation and quotation marks omitted).

While the investors' fifty-five page complaint is lengthy and packed with allegations, the bulk of it is comprised of background facts that can be distilled into two allegedly "untrue statement[s] of a material fact or omission[s] of a material fact" that distorted the price of the security. 15 U.S.C. § 78-5u(c)(1). The investors allege first that Cutera omitted material information about the weakness of its junior sales force in its statements of January 31, 2007, and second, that Cutera made faulty earnings projections. We begin with a close examination of the basis of the allegations regarding the January disclosure about the junior sales force juxtaposed with later clarifications in April and May.

As the investors concede, their complaint is not based on the shortcomings or failure of the junior sales force but what they characterize as a lack of disclosure about its failure. In Cutera's January 31, 2007 conference call reporting results for the fourth quarter of 2006 and projections for 2007, chief executive officer Connors stated:

> [W]e wanted to have a more junior sales force focus on a certain segment of the market. We didn't get the productivity we were looking for with that.
>
> However, the portion of our sales force — the senior portion of the sales force showed modest improvement in sales productivity. So we have since made modifications to the [alignment] of the sales organization, and we anticipate having improved productivity from the sales force as a whole.

Responding to analysts' questions about turnover in the fourth quarter of 2006, Connors and Santilli, the chief financial officer, stated that turnover was "nothing appreciable," "normal," and "nothing unusual." The investors claim that these

responses were materially misleading because by mid-January, officers at Cutera had already informed the junior sales force that they were going to be phased out and they could seek senior sales positions with Cutera, positions with Cutera's distributor, or find employment elsewhere.[3]

When Cutera adjusted its revenue projection down on April 5, 2007, in a press release, Connors attributed the shortfall "primarily to lower than expected productivity levels of our recent sales expansion." Connors also stated that Cutera was "implementing specific initiatives to address [the shortfall] and remain confident in our ability to increase our revenue growth." By May 7, Connors referred to the first quarter of 2007 as marked by "aberrantly high turnover." The May 7 press release summarized the disappointing results from the first quarter of 2007, with Connors attributing "the poor performance of our North American sales team [to] the unsuccessful implementation of our junior sales program, unusually high sales employee turnover, and disappointing results from . . . national accounts."

Among the strategic initiatives identified to improve performance was a continuing endeavor "to restructure [the] sales-force with senior, experienced sales people, [having] discontinued the junior sales program . . . ." At the press conference that day, Connors acknowledged that the junior sales force program "was a deviation from [Cutera's] previously successful sales force expansion practice of hiring senior sales people . . . ." In describing the failure of the junior sales force, Connors explained that "[Cutera] believed that [it] hired many dedicated enthusiastic people, but the model did not prove

---

[3]The investors support this allegation with the testimony of two confidential witnesses, one recounting a mid-January meeting where the North American sales manager informed junior sales representatives of their planned phase-out, and one testifying based on personal knowledge about a single junior sales representative who left the company in the fourth quarter of 2006.

successful . . . and instead resulted in low productivity and consumed a considerable amount of sales management attention." *Id.*

**[3]** The investors sufficiently state a factual basis for the claim that Cutera knew about the weakness of its junior sales force by January 31, 2007, as one confidential witness testified that senior management had already effectively given the group its walking papers.[4] As the district court correctly concluded, however, there is no material difference between what Cutera disclosed in January and what it disclosed in later reports and conference calls.

**[4]** The January disclosures about necessary "modifications to the [alignment] of the sales organization," are not materially different from later disclosures that Cutera was "implementing specific initiatives to address" the shortfall, and restructuring its sales force with "senior, experienced sales people," having "discontinued the junior sales program." To the extent the investors allege that an earlier disclosure of the details of the sales force reorganization would have made a material difference in their investment choices, we agree with the district court that the investors have not raised a plausible claim that stock prices fluctuated with disclosures about the sales staff, or that a reasonable investor would have received a materially different impression of Cutera's state of

---

[4]Other allegations lack a sufficient factual basis. For example, the facts alleged do not support the investors' claim that nine sales representatives left Cutera in the fourth quarter of 2006. While one confidential witness identified a junior sales representative that left Cutera in the fourth quarter of 2006, that departure is consistent with statements that turnover in the fourth quarter of 2006 was "nothing appreciable," "normal," and "nothing unusual."

The investors also allege that Cutera reported total U.S. sales representatives in its 2006 10-K Report, instead of total North American sales representatives (U.S. & Canadian) as it reported in its 2005 10-K report, to hide employee turnover in the fourth quarter of 2006. This variation in reporting raises no material inconsistency.

affairs had the company used the language from the April 5 or May 7 press releases to describe the sales shortfalls in its January 31 statements.

[5] The investors also take issue with Cutera's assertion in its 2006 10-K report that "[n]one of our employees is represented by a labor union, and we believe our employee relations are good," noting that many employees were already on their way out the door. When valuing corporations, however, investors do not rely on vague statements of optimism like "good," "well-regarded," or other feel good monikers. This mildly optimistic, subjective assessment hardly amounts to a securities violation. Indeed, "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *See VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993). Similar statements have been held to be non-actionable puffing. *See In re Syntex Corp. Sec. Litig*, 855 F. Supp. 1086, 1095 (N.D. Cal. 1994), *aff'd*, 95 F.3d 922 (9th Cir. 1996) (holding as non-actionable puffing the phrases " 'we're doing well and I think we have a great future,' 'business will be good this year . . . we expect the second half of fiscal 1992 to be stronger than the first half, and the latter part of the second half to be stronger than the first . . .,' 'everything is clicking [for the 1990s] . . . new products are coming in a wave, not in a trickle . . . old products are doing very well' and that 'I am optimistic about Syntex's performance during this decade' "). In the end, Cutera's speculative inference approach fails both the particularity and materiality requirements.

## II. SAFE HARBOR

[6] The PSLRA also provides an additional barrier at the pleading stage in the form of a safe harbor for "forward-looking statements." A forward-looking statement is "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share,

capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. § 78u-5(i)(A). The safe harbor provision states in relevant part that:

> a person . . . shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—
>
>> (A) the forward-looking statement is—
>>
>>> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>>>
>>> (ii) immaterial; or
>>
>> (B) the plaintiff fails to prove that the forward-looking statement—
>>
>>> (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
>>>
>>> (ii) if made by a business entity;[,] was—
>>>
>>>> (I) made by or with the approval of an executive officer of that entity; and
>>>>
>>>> (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1).

**[7]** The January 31 earnings projection is by definition a forward-looking statement. 15 U.S.C. § 78u-5(*i*)(1)(A). We agree with the district court that the revenue projections and the eventual shortfall in actual revenue plausibly drove fluctuations in Cutera's stock price. Thus, the projections are not immaterial under subsection (A)(ii).

The January 31 revenue projections may still fall within the safe harbor in either of two circumstances: if they were identified as forward-looking statements and accompanied by meaningful cautionary language, under subsection (A)(i); or if the investors fail to prove the projections were made with *actual* knowledge that they were materially false or misleading, under subsection (B).

Subsection (B) governs unidentified forward-looking statements and forward-looking statements unaccompanied by meaningful cautionary language. Those statements fall outside the safe harbor if the plaintiff can allege facts that would create a strong inference that the defendants made the forecast(s) at issue with "actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B)(i); *see also Employers Teamsters Local Nos 175 and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1134 (9th Cir. 2004). Under subsection (A)(i), however, if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter.

**[8]** The investors' sole allegation referencing the safe harbor lacks specificity, providing only conclusory allegations in the alternative that either (i) "there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements" or (ii) "at the time each of the forward-looking statements was made, the particular

speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Cutera, who knew that those statements were false when made."

In its motion to dismiss, Cutera invoked the safe harbor under subsection (A)(i), citing to the language identifying the revenue projections in its January 31 press release and conference call as forward-looking statements, and highlighting the cautionary language that spoke directly to the purported misstatements alleged by the complaint. As to the first half of that conclusory allegation, Cutera's January 31 conference call began with a notice that "these prepared remarks contain forward-looking statements concerning future financial performance and guidance," that "management may make additional forward-looking statements in response to [ ] questions," and that factors like Cutera's "ability to continue increasing sales performance worldwide" could cause variance in the results. Cutera affirmatively warned that its ability to compete and perform in the industry depended on the ability of its sales force to sell products to new customers and upgraded products to current customers, and that failure to attract and retain sales and marketing personnel would materially harm its ability to compete effectively and grow its business.

**[9]** Perhaps recognizing that Cutera's forward-looking statements meet the requirements of subsection (A)(i), the investors argue for a conjunctive reading of the safe harbor provision, under which a sufficiently strong inference of actual knowledge would overcome a claim of safe harbor protection even for statements identified as forward-looking and accompanied by meaningful cautionary language. The difficulty with this approach is that it ignores the plain language of the statute, which is written in the disjunctive as to each subpart. As written, the statute provides a safe harbor for:

(A)(i)    identified forward-looking statements with sufficient cautionary language;

(A)(ii)          immaterial statements; and

(B)(i)-(ii)    unidentified forward-looking statements or forward-looking statements lacking sufficient cautionary language where the plaintiff fails to prove actual knowledge that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1). It would be anomalous indeed if a false but immaterial statement would fall outside the safe harbor, but that is the result of the investors' proposed construction. The logical reading of the statute is simply to take it as written — subsections (A) and (B) and their subpoints each offer safe harbors for different categories of forward-looking statements. The defendants' state of mind is not relevant to subsection (A). To read the provisions otherwise would make no sense.

[10] The investors' proposed conjunctive construction of the safe harbor is not only inconsistent with the statutory language, but has been rejected by all of our sister circuits to consider the question. *See Southland Secs. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 371-72 (5th Cir. 2004) (holding that subsection (A)(i) "focus[es] on the defendant's cautionary statements" while subsection (B)(i) focuses "on the defendant's state of mind"); *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003) ("[F]or 'forward-looking statements' that are accompanied by meaningful cautionary language, [subsection (A)(i)] makes the state of mind irrelevant."); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 554 (6th Cir. 2001) (holding the disjunctive reading mandated by the statutory text), *overruled in part on other grounds as stated in Konkol v. Diebold, Inc.*, 590 F.3d 390, 396 (6th Cir. 2009); *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999) (holding that where all allegedly false statements were identified as forward-looking statements and accompanied by cau-

tionary language, "the defendant's state of mind is irrelevant"). We join with their reasoned interpretation.

The investors' citation to *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. American West Holding Corp.*, 320 F.3d 920, 937 n.15 (9th Cir. 2003), is not persuasive. There, we held that the statements were neither forward-looking nor accompanied by the requisite "meaningful cautionary statement." *Id.* at 937. In a footnote, we suggested that "a strong inference of actual knowledge" could except forward-looking statements from the safe harbor rule. This passing reference offered no statutory analysis or discussion of the safe harbor itself, and can only be characterized as obiter dicta.[5]

## CONCLUSION

[11] The investors' claims fail because they do not allege material facts regarding the nature of the sales program. They also cannot overcome safe harbor protection for Cutera's January 31, 2007 forward-looking revenue projections, which were accompanied by cautionary language. The district court's order granting Cutera's motion to dismiss is **AFFIRMED.**[6]

---

[5]Our clear statement today that the statute should be read in the disjunctive should clear up the issue for the handful of district courts that have embraced that passing reference as a holding from this court. *See e.g., In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1250 (N.D. Cal. 2008); *In re Dura Pharmaceuticals, Inc. Secs. Litig.*, 548 F. Supp. 2d 1126, 1143 (S.D. Cal. 2008); *Glenbrook Capital L.P. v. Kuo*, 525 F. Supp. 2d 1130, 1136 (N.D. Cal. 2007). *But see, e.g., In re SeeBeyond Techs. Corp. Secs. Litig.*, 266 F. Supp. 2d 1150, 1165 (C.D. Cal. 2003)

[6]The district court did not directly address the investors 20(a) claim. However, "[t]o be liable under section 20(a), [Cutera] must be liable under another section of the Exchange Act." *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir. Cal. 1999) (citing 15 U.S.C. § 78t(a)). Because the § 10(b) claims were properly dismissed, the § 20(a) claims were also properly dismissed.